FILED
2005 Mar-08  AM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

FILED
FAYETTE COUNTY
J. EDDY SMITH

IN THE CIRCUIT COURT OF FAYETTE COUNTY, ALABAMA

2005 FEB 18  AM 9: 11

STEVE STRICKLAND, ET AL      )
                                           )

         PLAINTIFF                )
                                           )

VS.                                  )      CASE NO. CV 05-019
                                           )

SONY CORPORATION OF AMERICA,   )
ET AL                                    )
                                           )

         DEFENDANT            )

## ORDER

On February 14, 2005, a Complaint for Wrongful Death was filed in this action by Steve Strickland as Personal Representative of the Estate of Arnold Strickland, deceased, and Henry Mealer, as Personal Representative of the Estate of Ace Mealer, deceased, by and through their undersigned counsel.

The Complaint was signed by Patrick Gray, Alabama Bar No. GRA-080 and by John B. Thompson and Raymond A. Reiser as Florida licensed attorneys and Alabama Pro Hac Vice applicants.

Section VII D of the *Rules Governing Admission to the State Bar* require that in order to appear as counsel before a court in this State, a foreign attorney shall file with the court or agency where the cause is pending a Verified Application for Admission to Practice, together with proof of service by mail, in accordance with the *Alabama Rules of Civil Procedure,* a copy of the application and notice of the hearing upon the Alabama State Bar at its Montgomery, Alabama, office.

John B. Thompson and Raymond A. Reiser have not filed Verified Applications.

Pleadings and motions signed by a non-resident attorney, who is not licensed to practice law in Alabama and is not admitted pro hac vice, are a nullity, *Tucker v. Morgan,* 833 So.2d 68 (2002) Ala. Civ. App. (2002).  Subsection J *Enforcement* provides that any pleadings or other documents filed in violation of the Rules *shall* be stricken from the record upon the motion of any party or by the Court or administrative agency *sua sponte* and a violation is deemed to be the unlawful practice of law.

ACCORDINGLY, IT IS ORDERED, ADJUDGED AND DECREED that the Complaint for Wrongful Death filed February 14, 2005, is and it is hereby stricken and dismissed.

Done and Ordered this 16th day of February, 2005.

James Moore, Circuit Judge
24th Judicial Circuit

cc:  All Counsel of Record
     All Unrepresented Parties

JAMES MOORE
CIRCUIT JUDGE
P.O. Box 778
Fayette, Alabama 35555
205/932-3169

SYBIL J. FULGHAM
Judicial Assistant

THOMAS E. "TED" HICKS
Court Reporter
Fayette, Alabama 35555

J. EDDY SMITH
Circuit Clerk
Fayette County
Fayette, Alabama 35555

Bobby Cowart
Circuit Clerk
Pickens County
Carrollton, Alabama 35447

CURTIS L. GRAHAM
Circuit Clerk
Lamar County
Vernon, Alabama 35592



# STATE OF ALABAMA

### OFFICE OF THE CIRCUIT JUDGE
### TWENTY-FOURTH JUDICIAL CIRCUIT
### OF ALABAMA
February 16, 2005

Alabama Bar Association
P. O. Box 671
Montgomery, AL  36101

> RE:  Steve Strickland, et al vs. Sony Corporation of American, et al
> Case No. CV 05-019 – Fayette County

To Whom It May Concern:

    I enclose a copy of an Order and Complaint for Wrongful Death filed in the Circuit Court of Fayette County, Alabama, which is self-explanatory for whatever action you deem necessary and proper.

Sincerely yours,

James Moore

JM/sf

Enclosure

IN THE CIRCUIT COURT OF FAYETTE COUNTY, ALABAMA

STEVE STRICKLAND, as Personal           §
Representative of the Estate of Arnold   §
Strickland, and HENRY MEALER, as        §
Personal Representative of the Estate of §
Ace Mealer,                              §
                                        §
        PLAINTIFFS,                      §
                                        §
VS.                                      §          CASE NO. CV-2005- _019_
                                        §
SONY CORPORATION OF AMERICA;             §
SONY COMPUTER ENTERTAINMENT,             §
INC., SONY COMPUTER ENTERTAIN-          §
MENT AMERICA, INC.; TAKE-TWO             §
INTERACTIVE SOFTWARE, INC.,              §
WAL-MART STORES, INC., GAMESTOP,         §
INC., DEVIN MOORE; and Fictitious        §
Party Defendants A – I, being those entities §
and/or individuals liable for the acts or §
omissions stated herein, whose identities §
are unknown at this time and who will be §
substituted as allowed by law,           §
                                        §
        DEFENDANTS.                      §

## SUMMONS – CERTIFIED MAIL

This service by certified mail of this summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Alabama Rules of Civil Procedure.

**Notice to Defendant:**

Sony Corporation of America
550 Madison Avenue
New York, NY 10022

The complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written answer, either admitting or denying each allegation in the complaint to Patrick O. Gray, the attorney for the Plaintiffs, whose address is Nelson, Dorroh, Gray & Newsome, LLC, 2216 14th Street (35401), P. O. Box 1788, Tuscaloosa, Alabama 35403.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your answer with the Clerk of this Court within a reasonable time afterward.

Dated: _2-14-05_

_____
Court Clerk

IN THE CIRCUIT COURT OF FAYETTE COUNTY, ALABAMA

STEVE STRICKLAND, as Personal     §
Representative of the Estate of Arnold     §
Strickland, and HENRY MEALER, as     §
Personal Representative of the Estate of     §
Ace Mealer,     §
    §
     PLAINTIFFS,     §
    §
VS.     §       CASE NO. CV-2005- *019*
    §
SONY CORPORATION OF AMERICA;     §
SONY COMPUTER ENTERTAINMENT,     §
INC., SONY COMPUTER ENTERTAIN-     §
MENT AMERICA, INC.; TAKE-TWO     §
INTERACTIVE SOFTWARE, INC.,     §
WAL-MART STORES, INC., GAMESTOP,     §
INC., DEVIN MOORE; and Fictitious     §
Party Defendants A – I, being those entities     §
and/or individuals liable for the acts or     §
omissions stated herein, whose identities     §
are unknown at this time and who will be     §
substituted as allowed by law,     §
    §
     DEFENDANTS.     §

## SUMMONS – CERTIFIED MAIL

This service by certified mail of this summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Alabama Rules of Civil Procedure.

     **Notice to Defendant:**

         Sony Computer Entertainment, Inc.
         550 Madison Avenue
         New York, NY 10022

The complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written answer, either admitting or denying each allegation in the complaint to Patrick O. Gray, the attorney for the Plaintiffs, whose address is Nelson, Dorroh, Gray & Newsome, LLC, 2216 14th Street (35401), P. O. Box 1788, Tuscaloosa, Alabama 35403.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your answer with the Clerk of this Court within a reasonable time afterward.

Dated: _2-14-05_

                     _____
                     Court Clerk

2005 FEB 14 PM — FILED FAYETTE COUNTY J. EDDY SMITH CIRCUIT CLERK

IN THE CIRCUIT COURT OF FAYETTE COUNTY, ALABAMA

STEVE STRICKLAND, as Personal §
Representative of the Estate of Arnold §
Strickland, and HENRY MEALER, as §
Personal Representative of the Estate of §
Ace Mealer, §
                                      §
          PLAINTIFFS,                 §
                                      §
VS.                                   §          CASE NO. CV-2005- *019*
                                      §
SONY CORPORATION OF AMERICA; §
SONY COMPUTER ENTERTAINMENT, §
INC., SONY COMPUTER ENTERTAIN- §
MENT AMERICA, INC.; TAKE-TWO §
INTERACTIVE SOFTWARE, INC., §
WAL-MART STORES, INC., GAMESTOP, §
INC., DEVIN MOORE; and Fictitious §
Party Defendants A – I, being those entities §
and/or individuals liable for the acts or §
omissions stated herein, whose identities §
are unknown at this time and who will be §
substituted as allowed by law, §
                                      §
          DEFENDANTS.                 §

## SUMMONS – CERTIFIED MAIL

This service by certified mail of this summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Alabama Rules of Civil Procedure.

**Notice to Defendant:**

          Sony Computer Entertainment America, Inc.
          P. O. Box 5888
          San Mateo, CA  94402-0888

The complaint which is attached to this summons is important and you must take immediate action to protect your rights.  You are required to mail or hand deliver a copy of a written answer, either admitting or denying each allegation in the complaint to Patrick O. Gray, the attorney for the Plaintiffs, whose address is Nelson, Dorroh, Gray & Newsome, LLC, 2216 14th Street (35401), P. O. Box 1788, Tuscaloosa, Alabama 35403.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.  You must also file the original of your answer with the Clerk of this Court within a reasonable time afterward.

Dated: _2-14-05_                    _____
                                              Court Clerk

FILED
FAYETTE COUNTY
J. EDDY SMITH
CIRCUIT CLERK
2005 FEB 14 PM 3: 26

IN THE CIRCUIT COURT OF FAYETTE COUNTY, ALABAMA

STEVE STRICKLAND, as Personal          §
Representative of the Estate of Arnold §
Strickland, and HENRY MEALER, as       §
Personal Representative of the Estate of §
Ace Mealer,                            §
                                       §
          PLAINTIFFS,                  §
                                       §
VS.                                    §          CASE NO. CV-2005- _19_
                                       §
SONY CORPORATION OF AMERICA;           §
SONY COMPUTER ENTERTAINMENT,           §
INC., SONY COMPUTER ENTERTAIN-         §
MENT AMERICA, INC.; TAKE-TWO           §
INTERACTIVE SOFTWARE, INC.,            §
WAL-MART STORES, INC., GAMESTOP,       §
INC., DEVIN MOORE; and Fictitious      §
Party Defendants A – I, being those entities §
and/or individuals liable for the acts or §
omissions stated herein, whose identities §
are unknown at this time and who will be §
substituted as allowed by law,         §
                                       §
          DEFENDANTS.                  §

## SUMMONS – CERTIFIED MAIL

This service by certified mail of this summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Alabama Rules of Civil Procedure.

**Notice to Defendant:**

> Take-Two Interactive Software, Inc.
> 622 Broadway
> New York, NY  10012

The complaint which is attached to this summons is important and you must take immediate action to protect your rights.  You are required to mail or hand deliver a copy of a written answer, either admitting or denying each allegation in the complaint to Patrick O. Gray, the attorney for the Plaintiffs, whose address is Nelson, Dorroh, Gray & Newsome, LLC, 2216 14th Street (35401), P. O. Box 1788, Tuscaloosa, Alabama 35403.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.  You must also file the original of your answer with the Clerk of this Court within a reasonable time afterward.

Dated:  _2-14-05_                              _____
                                                        Court Clerk

IN THE CIRCUIT COURT OF FAYETTE COUNTY, ALABAMA

STEVE STRICKLAND, as Personal    §
Representative of the Estate of Arnold    §
Strickland, and HENRY MEALER, as    §
Personal Representative of the Estate of    §
Ace Mealer,    §
   §
      PLAINTIFFS,    §
   §
VS.    §       CASE NO. CV-2005- *19*
   §
SONY CORPORATION OF AMERICA;    §
SONY COMPUTER ENTERTAINMENT,    §
INC., SONY COMPUTER ENTERTAIN-    §
MENT AMERICA, INC.; TAKE-TWO    §
INTERACTIVE SOFTWARE, INC.,    §
WAL-MART STORES, INC., GAMESTOP,    §
INC., DEVIN MOORE; and Fictitious    §
Party Defendants A – I, being those entities    §
and/or individuals liable for the acts or    §
omissions stated herein, whose identities    §
are unknown at this time and who will be    §
substituted as allowed by law,    §
   §
      DEFENDANTS.    §

## SUMMONS – CERTIFIED MAIL

This service by certified mail of this summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Alabama Rules of Civil Procedure.

    **Notice to Defendant:**

                Wal-Mart Stores, Inc.
                702 N.W. 8th Street
                Bentonville, AR  72716

The complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written answer, either admitting or denying each allegation in the complaint to Patrick O. Gray, the attorney for the Plaintiffs, whose address is Nelson, Dorroh, Gray & Newsome, LLC, 2216 14th Street (35401), P. O. Box 1788, Tuscaloosa, Alabama 35403.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your answer with the Clerk of this Court within a reasonable time afterward.

Dated: _2-14-05_                             _J. Eddy Smith/New_

FILED
FAYETTE COUNTY
J. EDDY SMITH
CIRCUIT CLERK
MAR 1 4 2005 PH 3: 26

IN THE CIRCUIT COURT OF FAYETTE COUNTY, ALABAMA

STEVE STRICKLAND, as Personal     §
Representative of the Estate of Arnold     §
Strickland, and HENRY MEALER, as     §
Personal Representative of the Estate of     §
Ace Mealer,     §
    §
         PLAINTIFFS,     §
    §
VS.     §      CASE NO. CV-2005-_19_
    §
SONY CORPORATION OF AMERICA;     §
SONY COMPUTER ENTERTAINMENT,     §
INC., SONY COMPUTER ENTERTAIN-     §
MENT AMERICA, INC.; TAKE-TWO     §
INTERACTIVE SOFTWARE, INC.,     §         *FILED*
WAL-MART STORES, INC., GAMESTOP,     §     CIRCUIT COURT
INC., DEVIN MOORE; and Fictitious     §
Party Defendants A – I, being those entities     §    FEB 14 2005
and/or individuals liable for the acts or     §
omissions stated herein, whose identities     §     *J. Guily Smith*
are unknown at this time and who will be     §
substituted as allowed by law,     §
    §
         DEFENDANTS.     §

## SUMMONS – CERTIFIED MAIL

This service by certified mail of this summons is initiated upon the written request of Plaintiffs' attorney pursuant to the Alabama Rules of Civil Procedure.

      **Notice to Defendant:**

                Gamestop, Inc.
                2250 William D. Tate Avenue
                Grapevine, TX 76051

The complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written answer, either admitting or denying each allegation in the complaint to Patrick O. Gray, the attorney for the Plaintiffs, whose address is Nelson, Dorroh, Gray & Newsome, LLC, 2216 14th Street (35401), P. O. Box 1788, Tuscaloosa, Alabama 35403.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your answer with the Clerk of this Court within a reasonable time afterward.

Dated: _2-14-05_                _(signature)_
                                      Court Clerk

## IN THE CIRCUIT COURT OF FAYETTE COUNTY, ALABAMA

STEVE STRICKLAND, as Personal §
Representative of the Estate of Arnold §
Strickland, and HENRY MEALER, as §
Personal Representative of the Estate of §
Ace Mealer, §
§
PLAINTIFFS, §
§
VS. §          CASE NO. CV-2005- *19*
§
SONY CORPORATION OF AMERICA; §
SONY COMPUTER ENTERTAINMENT, §
INC., SONY COMPUTER ENTERTAIN- §
MENT AMERICA, INC.; TAKE-TWO §
INTERACTIVE SOFTWARE, INC., §
WAL-MART STORES, INC., GAMESTOP, §
INC., DEVIN MOORE; and Fictitious §
Party Defendants A – I, being those entities §
and/or individuals liable for the acts or §
omissions stated herein, whose identities §
are unknown at this time and who will be §
substituted as allowed by law, §
§
DEFENDANTS. §

FILED
CIRCUIT COURT

FEB 14 2005

*J. Coldy Smith*

### SUMMONS

To any Sheriff or any person authorized by either Rules 4.1(b)(2) or 4.2(b)(2) or 4.4(b)(2) of the Alabama Rules of Civil Procedure to effect service.

You are hereby commanded to serve this summons and a copy of the complaint in this action upon Defendant:

Devin Moore
c/o Tuscaloosa County Jail
Tuscaloosa, Alabama 35401

Notice to Defendant

The complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written answer, either admitting or denying each allegation in the complaint, to Patrick O. Gray, attorney for the Plaintiffs, Nelson, Dorroh, Gray & Newsome, LLC, 2216 14th Street (35401), P. O. Box 1788, Tuscaloosa, Alabama 35403.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. You must also file the original of your answer with the Clerk of this Court within a reasonable time afterward.

Dated: *2-14-05*                    *Court Clerk*

IN THE CIRCUIT COURT OF FAYETTE COUNTY,

ALABAMA

| | | |
|---|---|---|
| STEVE STRICKLAND, as Personal Representative of the Estate of Arnold Strickland, and HENRY MEALER, as Personal Representative of the Estate of Ace Mealer, <br><br> PLAINTIFFS, <br><br> VS. <br><br> SONY CORPORATION OF AMERICA; SONY COMPUTER ENTERTAINMENT, INC., SONY COMPUTER ENTERTAIN-MENT AMERICA, INC.; TAKE-TWO INTERACTIVE SOFTWARE, INC., WAL-MART STORES, INC., GAMESTOP, INC., DEVIN MOORE; and Fictitious Party Defendants A – I, being those entities and/or individuals liable for the acts or omissions stated herein, whose identities are unknown at this time and who will be substituted as allowed by law, <br><br> DEFENDANTS. | § § § § § § § § § § § § § § § § § § § § § § § § § | CASE NO. CV-2005-_____ <br><br> FILED ... OF COURT |

## COMPLAINT FOR WRONGFUL DEATH

COMES NOW Steve Strickland, as Personal Representative of the Estate of Arnold Strickland, deceased, and Henry Mealer, as Personal Representative of the Estate of Ace Mealer, deceased, by and through their undersigned counsel, and bring this complaint for money damages, stating:

### SUBJECT MATTER JURISDICTION

1.     This is a civil action in an amount in excess of the jurisdictional minimum requirements of this court.

## JURISDICTION OVER THE PARTIES

2.      Steve Strickland and Henry Mealer (hereinafter Plaintiffs), are residents of Fayette County, Alabama.  Many of the events giving rise to this cause of action, including the murders of Officer Arnold Strickland, Officer James Crump, and Dispatcher Ace Mealer, occurred in Fayette County, Alabama.  Defendant Devin Moore (hereinafter Moore) is a resident of Fayette County, Alabama.  Wal-Mart Stores, Inc. (hereinafter Wal-Mart) and GameStop, Inc. (hereinafter GameStop), are organized under the laws of a state other than Alabama but are registered to do and doing business in Alabama, and each has numerous stores in Alabama.  Sony Corporation of America, Sony Computer Entertainment, Inc., Sony Computer Entertainment America, Inc. (hereinafter collectively referred to as Sony) and Take-Two Interactive Software, Inc. (hereinafter Take-Two), are organized under the laws of a state other than Alabama and selling their respective products in this state.  Fictitious Party Defendants A – I are those entities and/or individuals liable for the acts or omissions stated herein and doing business in the State of Alabama or otherwise having contacts with the State of Alabama, whose legal identities are unknown at this time and who will be substituted as allowed by law.

## VENUE

3.  Given the aforestated facts, Fayette County, Alabama, is the appropriate venue for this action.

## BACKGROUND FACTS COMMON TO ALL COUNTS

4.  On December 1, 1997, five and one-half years prior to the three murders that have given rise to this cause of action, fourteen-year-old Michael Carneal took a handgun

2

out of his backpack and opened fire on his fellow students at a school prayer meeting in the hallway of Heath High School in Paducah, Kentucky.

5.    Carneal fired eight times, wounding eight different students, permanently paralyzing one and killing three other students.

6.    Carneal was a handgun novice with no real experience in firing such a weapon, yet his marksmanship was remarkable. What was even more remarkable was his shooting technique, which included targeting the heads of some of the victims and firing only once at each student. A gun novice will empty his gun into the initial target until he acquires visual confirmation that the target is "down." If Carneal had done that, he would have, most likely, shot and killed just one student.

7.    Carneal developed his counter-intuitive, unnatural, one-shot-per-target technique from playing and training on violent M-rated ("M" stands for mature audience, seventeen years of age and older) video games such as the video game *Doom*. Such games are inappropriate for and harmful to teens, not just to those playing them but also to innocent third parties who might get in their way.

8.    Diane Schetky, M.D., a world-renowned forensic pediatric psychiatrist trained at Yale, with a specialty in teen homicide, concluded in the midst of Carneal's criminal proceedings that but for Carneal's consumption of certain violent entertainment, including specific violent, M-rated video games, Carneal would not have killed. What Carneal consumed wound up consuming him and tragically altering the lives and fortunes of eight different families.

9.    Carneal, in other words, was provided by the video game industry, including the manufacturers of the games and the platforms on which they were played, along with

3

the retail establishments at which Carneal procured the games, virtual reality murder simulators that grew an appetite to kill and trained him to kill efficiently.

10.    In early April 1999 one of the undersigned counsel appeared on NBC's *Today* show with three of the parents of the three girls slain by Michael Carneal, having the day before filed a wrongful death action against, among others, certain video game industry Defendants.  *Today* host Matt Lauer asked what our gravest concern was.  We stated that we fear that other American teenaged boys in other American high school would do what Carneal had done, or worse, having trained on the same violent video games.

11.    Eight days later, after that prediction of a foreseeable event, two Colorado teenagers, Dylan Klebold and Eric Harris, gave America and the world "Columbine." When Klebold and Harris were done committing the worst school massacre at the hands of students in American history, fourteen students and one teacher lay dead, with twenty others wounded.    "Columbine" became a watershed moment in American history. President Reagan's great speechwriter, Peggy Noonan, wrote days after "Columbine" that with "Columbine a line for Americans was crossed, a point at which parents realized the popular entertainment in which our children swim is toxic waste harmful to their health and  perilous to the safety of others."

12.    Specifically, Klebold and Harris trained on the very same game, *Doom,* as had Michael Carneal in Paducah.  They named their shotgun after one of the characters in the game.  They stated in their videotaped suicide note that they wanted to replicate *Doom* in the hallways of Columbine.  It was reported that they were sold by the game manufacturer software that allowed them to morph the faces of their classmates from

their yearbook onto the bodies of the humans they practiced killing, even able to alter, news reports indicated, the color and dimensions of the hallways through which they stalked their virtual human prey to duplicate the hallways of Columbine.

13.  The video game industry, then, had provided Klebold and Harris, just as it had provided Michael Carneal, a virtual reality killing field in which to practice killing human beings efficiently and with the imparted notion that to do so, in any setting, is fun, appropriate, and consequence-free.  The video game industry armed them to kill as surely as did the retail gun dealers who illegally sold Klebold and Harris the guns with which they killed.

14.  President Clinton ordered the federal government, because of Columbine, to determine why America, beginning in the mid 1990s, began to experience the phenomenon of school shootings.  The FBI and the Secret Service determined that the one common denominator in these shootings was the immersion of the perpetrators in violent entertainment, including M-rated, violent video games.

15.  No entertainment company in the world, after "Columbine," and certainly not after the findings of the causes of that and other similar acts of teen violence, could plausibly claim that it was not foreseeable that violent entertainment would spawn such copycat teen violence.

16.  President Clinton, shortly after Columbine, also ordered the Federal Trade Commission (FTC) to ascertain to what extent adult-rated violent or sexually explicit popular entertainment was being marketed and then sold to individuals in age groups below the age indicated as appropriate consumers of these respective products.  The FTC found that more than 90% of all such products, including explicit lyric music, R-rated

movies, and M-rated video games were being marketed and sold to teenagers. One Hollywood movie studio was caught doing a focus group at a Campfire Girls meeting of 12- and 13-year-old girls to see which R-rated movie trailer would most entice them to go see a movie no one under 17 years of age should see.

17.   In ordering this FTC investigation, President Clinton stood in the Rose Garden with an African American boy who held up a video game magazine for kids which contained an ad proclaiming "This game is more fun than killing your neighbor's cat."

18.   After Columbine, major entertainment industry groups, including the Interactive Digital Software Association, now known as the Entertainment Software Association, which is the lobbying group that represents the video game industry, promised to take necessary steps to stop the marketing and sale of M-rated violent and sexually explicit video games to children below the age of 17 years, all the while proclaiming that violent video games harm no one.

19.   The promises and the assurances of the violent video game industry were dangerously hollow ones, as repeated "stings" since then, by the Federal Trade Commission, by other government entities at local and state levels, by the news media, and by interest groups and private citizens, including some by one of the undersigned counsel, have repeatedly proven that even today, nearly six years after "Columbine," M-rated violent and sexually explicit video games are still being aggressively marketed and sold to children of all ages, with even the most popular of all violent video games, *Grand Theft Auto: San Andreas*, made by Defendant Take-Two, readily available and easily

6

purchased by children as young as fourteen years of age across America in large and small major retailers of video games.

20. Thus, the video game industry and its retailers, despite the foreseeability and the known danger of copycat killings and other violence spawned by these M-rated games, nevertheless has not stopped and will not voluntarily stop marketing and selling these murder simulators to children.

21. The acts of copycat violence and killings linked by law enforcement, by healthcare providers, and by experts in various areas of expertise to violent video games have continued to rise precipitously in frequency. Specific crimes linked to specific games have grown in number and ferocity.

22. More specifically, a carjacking gang of young people, some of them teens, in Oakland, California, calling themselves the "Nutcases," were trained to commit these carjackings, some of which resulted in death, by older ringleaders who used *Grand Theft Auto III* as a virtual reality carjacking simulator. Oakland's lead homicide detective investigating the "Nutcases" established the causative link to the video game, as one young perpetrator in jail said "We played the game by day and lived the game by night." *Grand Theft Auto III* got them "fired up" to do the carjackings, and it taught them how to do the carjackings.

23. Everyone in the video game industry either knew or should have known of the copycat carjackings and killings in Oakland. They occurred months before these killings in Fayette, Alabama.

24. In October 2002 one of the undersigned counsel was asked by Matt Lauer on NBC's *Today* show if he had an opinion as to who the triggerman was in the Washington,

7

D.C. Beltway Sniper killings. One of the undersigned stated that the recovered tarot card and certain other forensics suggested strongly that it would be "a teenaged boy trained on a sniper video game." Two weeks later, John Muhammad and Lee Boyd Malvo were apprehended. Two months later *Dateline NBC* reported that the teenaged triggerman, Lee Boyd Malvo, "was required by the older Muhammad to train on a sniper video game, Microsoft's *Halo*, in order to suppress Malvo's evident reluctance to kill as a sniper. The desensitization worked."

25.    The aforementioned Yale psychiatrist Diane Schetky, who had testified in Paducah, testified at Malvo's criminal trial to the various methods of indoctrination and control of Muhammad by Malvo, which included video game training.

26.    Similarly, the Columbus, Ohio, "Serial Highway Shooter," Charles A. McCoy, Jr., apprehended last year, was an obsessive video game player who played violent first-person shooter video games. His fascination with highway shooting games predictably spilled over from virtual reality to real reality.

27.    Indeed, the Gallup Poll organization found and reported in 2003 that "male American teenagers who had played *Grand Theft Auto: Vice City* were twice as likely to have been engaged in an act of violence than those who had not played that one game." Thus, the danger to innocent third parties posed specifically by the *GTA* video games has been known to the video game industry for a number of years prior to the three murders giving rise to this cause of action.

28.    More generally, health care providers, law enforcement organizations and officials, and the entertainment industry itself have known for decades the direct causal

link between violent and/or sexually explicit entertainment and human behaviors copycatting that material.

29.   There is not room in this complaint to recite all of the evidence that conclusively links entertainment to sociopathic behavior, but here is just one such proof that suggests there is a tsunami of evidence the entertainment industry has chosen, for reasons of ideology and profit, to ignore:  On July 26, 2000, certain leaders of the public health community issued a statement.   These leaders included, on behalf of their respective organizations, the President of the American Academy of Child and Adolescent Psychiatry, the President of the American Academy of Pediatrics, the Deputy Chief Executive Officer of the American Psychological Association, and the Executive Vice President of the American Medical Association.   No one paid them to testify thusly before a joint committee of both houses of Congress.  They testified:

30.   "At this time, well over 1000 studies—including reports from the Surgeon General's office, the National Institute of Mental Health, and numerous studies conducted by leading figures within our medical and public health organizations—our own members—point overwhelmingly to a causal connection between media violence and aggressive behavior in some children.   The conclusion of the public health community, based on over 30 years of research, is that viewing entertainment violence can lead to increases in aggressive attitudes, values, and behavior, particularly in children.  Its effects are measurable and long lasting.  Moreover, prolonged viewing of media violence can lead to desensitization toward violence in real life."

31.  This Joint Statement was issued nearly three full years prior to the murders by a teenager of three law enforcement personnel in Fayette, Alabama, that give rise to this

9

cause of action.  No one, especially no one involved in the design, making, manufacture, marketing, and sale of violent adult-rated video games, can or could credibly assert that it was not foreseeable that some younger people, upon consuming such material, would not copycat or otherwise act out such entertainment.

32.  Not all harm done to minors who consume violent entertainment results in violence by all, but the harm to the vast majority of minors who consume such entertainment is real, although manifested differently.  Some "go Columbine," and some do not.  Not all who smoke tobacco develop lung cancer or emphysema, but all now recognize that cigarette smoking is harmful.  Similarly, there is a continuum of harm done to minors who consume violent entertainment, with the degree of "acting out" resulting therefrom dependent upon a number of factors, including but not limited to a) how young the individual was when he began to consume it, b) how much he consumed it, c) how violent the specific products are, d) certain risk factors unique to the specific individual, and e) other causative factors.

33. A video game may not, by itself, cause a teen or another individual to kill, but it can provide an indispensable or final link in a causal chain that results in tragedy.  The entertainment industry, and the video game industry in particular, know full well of these causal chains of tragedy of which their products are one of the links, as proven by law enforcement and by the public health community.  The entertainment industry, in particular the video game industry, knows of these risks.  But for video games, countless individuals, including these three slain men in Fayette, Alabama, would be alive today.

34.  These video game tragedies even have names, names arising from where the tragedies occurred, much like the names "Bull Run" and "Gettysburg" and "Manassas"

echo the tragedies of massacres 140 years ago.  They are:  Pearl, Mississippi; Jonesboro, Arkansas; Bethel, Alaska; Santee, California; Paducah; Columbine; Conyers, Georgia; Ft. Myers, Florida; Medina, Ohio; Grand Rapids, Michigan; the "Nutcases" of Oakland, California;  Cold Spring, Minnesota;  St. Paul, Minnesota;  Knoxville, Tennessee; Wellsboro, Pennsylvania; Red Lion, Pennsylvania; Erfurt, Germany; the Washington, D.C. Beltway Snipers; the Columbus, Ohio Serial Highway Shooter; Lake Worth, Florida; Miami, Florida; Ft. Worth, Texas; Fairfax, Virginia; York, New York; Redondo, New Mexico; Leicester, England; West Union, Ohio; Alberta, Canada; Dallas, Texas; Atlanta, Georgia; Oaklyn, New Jersey; Charlotte, North Carolina; Hudson, Wisconsin; and on and on.  Now the video game industry can add Fayette, Alabama, to its long, tragic list of denials.

35.  Stunning but highly credible and corroborated neurobiological science proves *why* violent entertainment, especially violent video games, must not be consumed by any individual under the age of twenty-five years.  Hard science, not junk science, emanating from Indiana University, Kansas State University, and Harvard University, shows that adolescents and teens process violent or emotion-laden visual entertainment in the mid-brain's amygdala, which is the seat of the emotions of the brain.

36.  Magnetic resonance imaging  tests (MRIs) at these institutions conclusively demonstrate a remarkable difference in blood flow differentials between brains younger than 25 years of age and those older than 25 years in the frontal lobes and the mid-brain and the hind-brain.  It is in the frontal lobes where rational thought and the differentiation between reality and fantasy occur.  In the younger brain, the processing of a video game in the mid-brain weds the emotions of anger and fear of the games to the violent images

of the game.  Harvard concludes that is why copycatting of entertainment by teens is so prevalent:  Emotions experienced in virtual reality, if then experienced in real or three-dimensional reality will call up the images structurally wedded to them in the mid-brain. When such images are recalled from the mid-brain, the emotion-laden behaviors suggested by them are triggered.

37.  Put another way, the amygdala is "calling the shots" in such a teenager's brain, with a diminution of rational control by the underdeveloped, immature frontal lobes.

38.  Indeed, a comparison of the MRIs of teen videogamers contrasted with those of nonvideogamers are frightening.  In the teen video gamer group, the mid-brain can be lit up like a Christmas tree, while the frontal lobes are dark.  There can be a near total shutdown, in particular, of the left frontal lobe, from which rational thought and analysis emanate.  The video game industry can thus, through operant conditioning resulting from thousands of replications of the virtual act of killing, train minors to be more aggressive, sometimes to be more violent, and sometimes to kill.

39.  This operant conditioning, this training, actually grows in the brain of the videogamer certain neural pathways called "dendrites" which are structures that provide the task-specific "wiring" that enable and predispose the gamer to respond to certain emotional stimuli in a certain way.  These dendrites are analogous, some neurobiologists have said, to the nubs on a player piano wheel.  Hit the "play button" in a video gamer's brain by triggering certain emotions such as fear, and the brain will then play the violent, killing tune manifested by action.

40.   Other brain scan studies at highly regarded American academic research facilities show that the virtual violence in video games is now so apparently real that the brain cannot differentiate between the observation and experience of real violence and virtual violence.   Virtual violence, as far as the brain can tell, is real violence.   Thus, preliminary scientific findings suggest that violent video games can exacerbate and possibly even cause or exacerbate post traumatic stress disorder in obsessive teen players of video games by alteration of the posterior cingulate in the rear of the right hemisphere of the brain.

41.   The troops of the Imperial Army of Japan, before and during World War II, were specifically trained to associate killing with pleasure when recruits, after engaging in brutalities, were rewarded with immediate sexual pleasures, food, and alcohol.   It was the technique utilized to get them to kill and to overcome the reluctance to kill.   The wedding in the brain of sex with violence is a particularly dangerous and powerful synergy, as the sex-control and violence-control regions of the brain physically overlap one another.   The *Grand Theft Auto* video games do just that, as they are killing games in which violence and sex are placed in the same context, thereby associating violence with sex and sex with violence.   This is not something teenaged boys should be taught, but these games are designed to teach just that.

42.   The public health sector, law enforcement agencies, and the entertainment industry have all steadily grown in their science-based knowledge of the peculiar harm done to teenagers, and the threats posed to others who might get in their way, by violent and sexually explicit entertainment, especially interactive or video game entertainment.

13

43.  "Paducah" occurred on December 1, 1997, and yet with what was known in April 1999, "Columbine" was not just "foreseeable." It was literally predicted eight days before it happened. The entertainment industry surely could not, after Columbine, claim that it did not know of the danger posed to innocent third parties by its video games which were and are appliances. They are "murder simulators." If the bereaved parents of Paducah and their lawyer knew of the danger and could even *predict* "Columbine," then the entertainment and media industry, sophisticated and accomplished in the powerful use of images to inspire and to sell, knew full well that it was playing recklessly with the safety of others in designing, making, marketing, and selling adult-rated, violent, and/or sexually explicit entertainment to minors.

44.  Indeed, minors in this country have always constituted a protected class of individuals as to what has been considered appropriate and legal consumption by them of certain products. Alcohol, tobacco, and firearms cannot be sold to anyone in this country under the age of twenty-one years.

45.  Anyone under sixteen cannot, in most states, operate legally a motor vehicle, in part because of the dangerous emotional impulses of teens.

46.  The movie industry has a rating system designed to keep anyone under seventeen years of age from viewing R-rated movies without a guardian or an adult.

47.  Alabama, just as do more than forty other states, prohibits the sale of sexual material harmful to minors. This is a recognition, through the democratic process which has resulted in laws in this and other states, that there are certain entertainment products that are inappropriate and in fact harmful to minors.

48.   Certain harmful products cannot, as a matter of law, even be marketed to minors.  Tobacco ads cannot legally target anyone under the age of twenty-one, and there is a total ban on the advertising of tobacco products on radio and television because of the likelihood that large numbers of minor individuals will see the ads and be persuaded to buy a product particularly harmful to them.   This protection of minors not just from certain products but from the advertising for such products is recognition, arrived at democratically, that marketing of harmful products to minors should not occur.

49.   Many people in the entertainment industry who have called for a ban on tobacco advertising to minors because it might encourage them to smoke state, categorically, that violent and/or sexually explicit entertainment cannot possibly modify teens' behaviors.  This hypocritical inconsistency is at the heart of why the entertainment industry is today making and marketing harmful products, including hyper violent and sexually-laced interactive killing simulators to minors, with disastrous results, including this tragedy in Fayette, Alabama.

50.   The United States Department of Defense has established an entity called the Institute for Creative Technologies on the campus of the University of Southern California at which taxpayer dollars are paid to video game industry companies to create virtual reality killing simulators  a) to suppress the inhibition to kill of new recruits, and b) to impart killing skills to those recruits.

51.   An abiding problem identified by the military, even during the War Between the States, is the need to condition young men who have been raised properly to kill other human beings.  Boys raised right by caring parents will not kill other human beings.  The

military, however, necessarily needs to get those same boys to kill other human beings.  It is the necessary and unavoidable nature of war.

52.   After World War I, our military found that the willingness-to-shoot rate among recruits went up if bulls-eye targets were replaced with two-dimensional human silhouette targets.  The willingness-to-shoot rate went up  further if human silhouettes were replaced with crude but simulations of killing.  The military has found that the more training targets approximate human forms, the greater the willingness of soldiers to kill on the battlefield.  Desensitization is thereby achieved.  In the mid-1990s, our Marines modified commercial versions of *Doom,* referenced above for its role in "Paducah" and "Columbine."  Now the military makes its own killing simulators from scratch at the Institute for Creative Technologies with virtual violence so real that the brains of soldiers cannot differentiate its images therein from real reality.  The willingness to shoot rate has shot sky high.  Soldiers put in a real, emotional battlefield situation will then more readily shoot, the inhibition to shoot having been overcome, because they are literally programmed to do so, with appropriate training, at the same time, as to when to shoot and at whom.

53. One of the most recent killing virtual reality simulators is called *Full Spectrum Command,* designed, made, and delivered to the Department of Defense by Pandemic Studios. DOD, satisfied that it had the desensitization and training effect upon new recruits, gave the green light to Pandemic Studios to market and sell this hyper violent killing simulator to teenaged American boys under the new name of *Full Spectrum Warrior.*  Our Defense Department got a better price for this outsourced work

16

than it otherwise would have paid because Pandemic knew it would be able to make additional profits on commercial sales to civilian teens.

54.   Not only has our Department of Defense subsidized the training of teenage civilians as to how to kill and to make it appear to be "cool" to kill, but credible evidence gleaned by counter-terrorism experts from Jihadist Internet web sites suggests that terrorists who are enemies of this country are training their operatives on *Full Spectrum Warrior* as well.

55.   The video game industry, in receiving taxpayer dollars, to create virtual reality killing simulators to suppress the inhibition to kill of new recruits well before the three murders that gave rise to this cause of action, cannot plausibly, credibly assert that it did not foresee that its killing games would not suppress the inhibition to kill of teenagers playing such murder simulation games.

56.   Soldiers trained on virtual reality killing simulators also receive other training as to whom to shoot and when.   They are taught to shoot ethically and in accord with military strictures.   Unsupervised civilian teenagers, on the other hand, receive no such ethical training.   Indeed, shooter games that reward shooting innocent bystanders in order to "win the game" teach the civilian teen to do just that.

57.   On a recent broadcast of *60 Minutes II,* Microsoft Chairman Bill Gates, the man whose company created *Halo,* which broke down Beltway Sniper Lee Boyd Malvo's inhibition to kill, he said what everyone in his video game industry knows:   "The thing that is so cool about these games is that they transport you to a world that you actually believe is real."

17

58.  Interactive video games are more powerful than passively consumed movies, because in playing a video game the player is the protagonist and an active participant in the mayhem. The player trains to kill and actually gets "fired up" to kill in a way that cannot be instilled by a motion picture.  That is why the military uses interactive virtual reality simulators—video games--not passively watched cinema, to train its soldiers to kill and to be more willing to kill.

59.  The nation of New Zealand, in banning all sales to *adults* as well as to minors, of another violent video game designed and made by Defendant Take-Two Interactive, Inc., stated:  "Calling the [Take-Two subsidiary] Rockstar North-developed game 'gruesome,' the OFLC filled a 12-page report with descriptions of its brutal levels and various weapons (which include garroting wire and plastic bags). 'It's a game where the only thing you do is kill everybody you see,' said Chief Censor Bill Hastings. 'You have to at least acquiesce in these murders and possibly tolerate, or even move towards enjoying them, which is injurious to the public good.'"  New Zealand has also banned for sale to adults the *GTA* video games marketed and sold to Defendant Moore in the United States.

60.  The video game industry, knowing of the effect virtual violence in interactive games has upon immature brains, designs these games to be physiological addictive. Teen "testers" during the design phase of game development are shown various killing scenarios to determine which ones most elevate the testers' interest, and with it their heart rates, respiration,  even the conductive sweat on their fingertips.

61.  The intentional or reckless design of these games to make them addictive has borne fruit.  Teenaged video gamers have been known to play these games for hours on

end, sometimes twelve hours or more.  Some video gamers, unable to pull themselves from their Playstation2s, have placed food and beverages on either side of their screens, with a bucket placed at their feet into which to relieve themselves, so unable are they to pull themselves away from the feast of killing.

62.   The video game industry has designed these games, then, to be addictive, in every sense of the word, just as the tobacco industry for years intentionally spiked tobacco with additional nicotine to make it even more addictive.

63.   Having made addictive games, the video game industry, including these Defendants, developed marketing and advertising plans and schemes to target minors with the games in order to assure that these dangerous, addictive games would be desired and demanded by teen video game consumers.  This was done both before "Columbine," and it has been done after "Columbine," despite promises by the video game industry to stop such marketing efforts.

64.   Since Columbine, all major retailers have been repeatedly caught by government, law enforcement, private organizations, and private individuals who have conducted "stings" thereby proving that despite stated industry and store "policies, " retailers have continued to sell M-rated (17 and over) mature video games to individuals under the age of 17.  These widely unenforced "policies" of the industry and industry retailers have been designed to make the industry appear to be "responsible," when in fact just the opposite has been the case.  Such fraudulent marketing and sales policies have been designed to provide "cover" to an industry which has grown wealthy in the sale of violent, sexually explicit video games marked "M" to adolescents and teens.

19

65. Finally, all but one of the corporate Defendants herein was warned, in writing, by one of the undersigned counsel, prior to the three murders that give rise to this cause of action, that specific killings in this country were being directly linked to the *Grand Theft Auto* games being sold to minors. Specific details of those killings were provided to these Defendants, at the hands of teenagers who had played those *Grand Theft Auto* games.

66. One of the undersigned counsel also appeared repeatedly on dozens of national television programs prior to these three killings to plead with the video game industry to stop marketing and selling M-rated violent video games to minors, citing scientific evidence proving the harm.

67. The Defendants knew of the harm they were doing. However, the video game industry now grosses greater revenues than the American movie industry. Too much money is being made, it seems, for this industry to act responsibly. This industry has been warned, with facts. The dangerous design, marketing, and sale of these M-rated to minors proceeds apace.

## ADDITIONAL FACTS

68. Defendant Take-Two and/or Take-Two's Rockstar Games and Rockstar North designed and manufactured *Grand Theft Auto III* and *Grand Theft Auto: Vice City*.

69. Take-Two has designed each *GTA* game exclusively, in its initial product release, for Sony's Playstation and Playstation2 gaming console platforms.

70. Defendants Take-Two and Sony have collaboratively marketed and distributed the *GTA* games, to minors and to adults, with the result that Sony benefited from additional sales of its Playstation2 consoles, given the popularity of the *GTA* games,

and Take-Two benefited from the wide popularity of the Playstation2 gaming platform. These two companies combined, then, to distribute to minors the most violent and most popular of all violent video games in history, the *GTA* games, which to date have sold approximately forty million units worldwide. At $50 per unit, these sales account for approximate gross revenues to Take-Two alone of two billion dollars.

71.   These are games in which the players are taught, in the words of one advertising campaign, that "Crime Really Does Pay."

72.   The *GTA* games are primarily "cop killing games." Innocent citizens are killed and when the law enforcement first responders arrive on the scene, the police are killed by various means. The killing of innocents makes the police arrive. Innocents and police are killed by various means:  shotguns, rifles, flamethrowers, knives, machetes, blunt instruments, running over them with vehicles, punching, stomping once they are down on the ground, including taking holstered handguns from arresting police officers and then shooting the officers at point-blank range, preferably in their heads.

73.   Such a cop-killing strategy in real reality has been called by law enforcement agencies "suicide by homicide," so overwhelming would be the typical police response to a single-handed assault upon a police department.

74.   However, in the virtual reality created in all of the *GTA* games, practice in killing innocents and then police "makes perfect," as eventually the player will be rewarded by learning how to kill all the police and take over "Vice City." Crime is rewarded. Violence is ultimately nothing more than a seemingly consequence-free game, and the more killing the more fun and the greater the rewards. The "rush" that comes with the killing makes killing pleasurable, as the body of the player releases dopamine,

21

endorphins, and other pleasure-inducing chemicals, with the result that desensitization to the act of killing occurs, because killing has been turned from a remorse-inducing event into a fun thrill ride.

75.   *Grand Theft Auto III* and *Grand Theft Auto: Vice City* both have an M-ratings, with the additional "descriptor" on each game indicating that each contains "blood and gore, violence, violence, strong language, strong sexual content." Absolutely no warning label as to this content or as to the harmful effects of this content has ever been placed on these two *GTA* games.

76.   Defendant Moore bought *Grand Theft Auto III* game at Defendant GameStop's Jasper, Alabama, store when he was a minor.

77.   While Moore was still a minor, he purchased *Grand Theft Auto: Vice City* at Defendant's Jasper, Alabama, Wal-Mart Superstore.

78.   Moore played each of these Take-Two *GTA* games incessantly, hour after hours, day after day, month after month.

79.   Defendant Wal-Mart and Defendant GameStop, at the time Defendant Moore bought the *Grand Theft Auto* games, intentionally and recklessly did not have in place effective policies to prevent the sale of M-rated video games to minors.  They still have no effective policies.

80.   Even if these Defendant retailers and other retailers had enforced a  policy not to sell M-rated games to anyone under 17 (which they did not do), the scientific evidence proves that they are particularly harmful, for reasons already enunciated herein, to anyone under the age of twenty-five.

81.  In addition, Alabama prohibits the sale of sexual material harmful to minors. Such prohibited material would include the *GTA* games as they feature simulated sexual intercourse with prostitutes who can then be killed by various means in order to get the player's money back and win the game faster.  The wedding of sex and violence, as already noted, is a dangerous amalgam. Most Alabama juries would find a simulator that trained a teenaged boy to have sex with a prostitute and then kill her as "sexual material harmful to minors."

82.  Thus, the sale of the *GTA* games to Defendant Moore while he was under the age of seventeen constituted a criminal act by those involved in the marketing and/or sale of the *GTA* games to him and other minors.

83.  As a result of the policies, actions, and behaviors of the corporate Defendants herein, Devin Moore purchased *Grand Theft Auto III* and *Grand Theft Auto: Vice City* from GameStop and Wal-Mart after Take-Two designed it, manufactured it, and marketed it with Sony, thereby targeting Defendant Moore and other teens.

84.  As the names of these two games suggest, these are games that glamorize the theft of automobiles.

85.  On or about June 7, 2003, Moore, after playing these games, carjacked a car and was arrested in Fayette County, Alabama.

86.  After Moore was arrested he was taken by Officer Arnold Strickland to the Fayette City Hall to be booked.  Present at the City Hall was Dispatcher Leslie Mealer. As Moore was being booked, James Crump arrived at the City Hall.

87.   As Moore was being booked by Officer Strickland, Moore seized Officer Strickland's handgun from its holster and killed Officers Crump and Strickland and Dispatcher Leslie Mealer by shooting them in their heads.

88.   Such a killing technique by shooting a victim in the head is extremely unusual and a learned, trained behavior.  Most killers, unless trained to the contrary, are drawn to the largest body mass—the abdomen—because it is easier to hit.  Also, there is a strong aversion to shooting anyone in the head as the face is the clearest "marker" of specific human identity.  Both of these *GTA* games reward "head shots."

89.   Upon killing these three men, Moore fled in a police car parked nearby in which he fled, only to be captured sometime later having driven west over the Alabama-Mississippi line.

90.   In the *GTA* games, one of the killing scenarios that can be practiced and is rewarded is this:   Upon carjacking a car and being arrested, the "heroic" criminal can grab the holstered gun of the arresting officer, even in the police station, shoot him and other officers, and flee in a carjacked police car.  This is exactly what Devin Moore did.

91.   Upon information and belief, Defendant Devin Moore formulated this response to his arrest in a highly emotional, fearful state in the station and acted upon it in the twinkling of an eye, much as one would do in the *GTA* cop-killing games he played for months, even years.  One is trained in the game to respond to fear with killing.

92.   In other words, the actions of the corporate Defendants trained Defendant Moore to kill in precisely the fashion that he killed these three men.  But for the operant training and the desensitization to killing imparted by the *GTA* games, Moore would not have killed these three men.

93.   The actions of the Defendants were together the proximate, legal, and/or contributing cause of the deaths of all three victims.

## THE LAW

94.   In *Rice v. Palladin Enterprises*, 128 F.3d 233 (4th Cir. 1997), cert. denied, 523 U.S. 1074 (1998), civil liability was imposed on the publisher of *Hit Man*, a contract murder instruction book that had been read and then used by a killer.  By analogy applied to this case now before this court, if the United States Supreme Court can allow to proceed a wrongful death action brought by the widow of a husband killed by an ***adult*** man who bought a book that trained him how to kill, then surely there is a legal basis provided by *Rice v. Palladin* and elsewhere for this case to proceed to discovery and then to a jury.

95.   The written word enjoys, and rightly so, the highest rung of constitutional protection under our state and federal constitutions.   Further, any communication, consumed by an *adult* as opposed to a minor, enjoys the highest rung of constitutional protection as to the *class* of individuals consuming it.

96.   Therefore, if the United States Supreme Court can countenance a wrongful death action  based upon a written book sold to and consumed by an adult, then surely there is a legal and constitutional basis for a wrongful death action based upon the wrongful marketing and sale of an adult-rated video game killing simulator to a minor.

97.   This "game" is in fact not even speech, but is in fact a device, an appliance, a murder simulator no less, that communicates no First Amendment information but rather trains a human being, especially minors, to enjoy the act of killing and to kill effectively.

THE EXPERTS

98.  Plaintiff has available to him  and his undersigned counsel nationally- and internationally-renowned experts, many if not all of whom have testified on multiple occasions before the United States Congress, about the dangerous effects of violent video game play by individuals and about the public safety hazard created by such play.

99.  These experts available to Plaintiff and to this court include but are not limited to specialists in psychology, psychiatry, law enforcement, military and warfare, education, neurobiology, and other areas of expertise.

100.  All of the assertions set forth within the four corners of this complaint should be taken and considered to be true, because the credible, renowned experts upon whose findings they are based will be able to prove them true to the trier of fact herein.

**DEFENDANT DEVIN MOORE**

101.  Plaintiffs reassert and reallege all of the foregoing and incorporates it into this count.

102.  Defendant Devin Moore owed each and every one of the men he shot and killed on June 7, 2003, in Fayette, Alabama, a duty of care not to harm them in any fashion whatsoever.

103.  Defendant Moore breached that duty of care by shooting fatally each and every one these three men.

104.  As a result of the breach of this duty and the commission of his various wrongful acts, Defendant Moore's wrongful acts are the legal and proximate cause of damages causing the wrongful deaths of all three men.

26

### DEFENDANT SONY AND FICTITIOUS PARTY
### DEFENDANTS A – I

105.   Plaintiffs reassert and reallege Paragraphs 1 through 100 and incorporate them into this Count.

106.   Defendant Sony and Fictitious Party Defendants A – I ("Defendant") designed, manufactured marketed, and/or supplied to Defendant Moore violent video games, specifically *Grand Theft Auto III* and *Grand Theft Auto: Vice City* which made the violence pleasurable and attractive, and disconnected the violence from the natural consequences thereof, thereby causing Moore to act out, copycat, replicate, and emulate the violence.

107.   Additionally, said games trained Moore how to point and shoot a gun in a fashion making him an extraordinarily effective killer without teaching him any of the constraints or responsibilities needed to inhibit such a killing capacity.

108.   This Defendant was negligent in doing so, thereby breaching a duty to Defendant Moore and also others, including the three men killed by Moore. This breach was a legal cause of harm to these three slain men. But for these *GTA* games, none of these three men would have been slain.

109.   More specifically, this Defendant Sony, created, manufactured, and/or distributed the games, and in doing so, this Defendant:

  a.  Knew or should have known that copycat violence would be caused by their products;

  b.  Knew or should have known that there was an unreasonable risk of harm to others either through the continuous effect of the video games or as continued by its negligence, or by the foreseeable action of others;

c.  Realized or should have realized that its actions involved an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person;

d.  Realized or should have realized that its actions involved an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal;

e.  Intended it to affect, or realized or should have realized, that its actions were likely to affect, the conduct of another or a third person in such a manner as to create an unreasonable risk of harm to the other;

f.  Knew that improper persons, namely minors, would be influenced by viewing the games and  then would cause harm to others;

g.  Intentionally and unreasonably subjected another to harm which it should have recognized was likely to result in illness or other bodily harm to other persons.  Thus, it is subject to liability to others for illness or other bodily harm of which the harm is a legal cause, although it may have had no intention of inflicting such harm, and irrespective of whether its actions were directed toward the other (such as Moore) or a third person (the three murdered men);

h.  Unintentionally caused harm to another, and in doing so it is subject to liability to the other for resulting illness or bodily harm since it: 1) should have realized that their conduct involved an unreasonable risk of causing the harm, otherwise than by knowledge of the harm or peril of a third person, and

2) from facts known to it, should have realized that the harm, if it were caused, might result in illness or bodily harm;

i. Supplied directly or through a third person  games it:   1) knew or had reason to know are or are likely to be dangerous for the use for which they are supplied, 2) had no reason to believe that those for whose use the games are supplied would realize its dangerous condition, and 3) failed to exercise reasonable care to inform them of its dangerous condition or of the facts which made them likely to be dangerous;

j. Supplied directly or through a third person games for another's use, knowing or having reason to know that the games were unlikely to be made reasonably safe before being put to a use which the supplier should expect them to be put, and thus it is subject to liability for harm caused by such use to those whom the supplier should expect to use the games or to be endangered by their probable use, and who are ignorant of the dangerous character of the games or whose knowledge thereof does not make them contributory negligent, although the supplier has informed the other for whose use the games are supplied of their dangerous character;

k. Supplied directly or through a third person  games for the use of another whom the supplier knew or had reason to know to be likely because of his youth, inexperience, or otherwise, to use them in a manner involving unreasonable risk of physical harm to others whom the supplier should expect to share in or be endangered by their use;

l.  Supplied directly or through a third person games for another to use for the suppliers' business purposes, knowing or having reason to know that they were or were likely to be dangerous for the use for which they were supplied;

m.  Supplied to another, directly or through a third person, games to be used for the suppliers' business purposes and thus are liable to those whom they should expect to be endangered by their probable use, for physical harm caused by the use of the games in the manner for which and by persons for whose use the games were supplied, in that it:   1) failed to exercise reasonable care to make the games safe for the use for which they were supplied, or 2) failed to exercise reasonable care to discover their dangerous condition or character, and to inform those whom it should expect to use them;

n.  Supplied through a third person the games to be used for the suppliers' business purposes thereby making it subject to liability although the dangerous character of the games was discoverable by an inspection which the third person is under a duty to the person injured to make;

o.  Knew or had reason to know the games to be, or to be likely to be, dangerous for use;

p.  Failed to exercise reasonable care in the making of the games which, because they were not carefully made, it should have recognized as involving an unreasonable risk of causing physical harm to those whom they should have expected to be endangered by their probable and lawful use in a manner and for a purpose for which it was supplied;

q.  Is subject to liability although the dangerous character or condition of the games was discoverable by an inspection which the seller or any other person was under a duty to the persons injured to make;

r.  Made these games using a formula intended to heighten, intensify, glamorize, and thus ultimately make more dangerous the violence and other harmful material found in the games, and even though the content of the games was disclosed to a limited degree to the potential viewing public, their content was not disclosed or warned of in a fashion that this would be likely understood by those whom they should expect to use them lawfully.  As such this Defendant is liable for physical harm caused to persons whom it should have expected to be endangered by their probable use by the failure to exercise reasonable care in using such a formula and the failure to adequately warn;

s.  Made, marketed, and/or  distributed the games under a plan or design which made them dangerous for the uses for which they were manufactured, and therefore it is liable to others whom it should expect to be endangered by their probable use for physical harm caused by its failure to exercise reasonable care in the adoption of a safe plan or design, manufacturing, marketing, and/or sale of the games;

t.  Was a seller or supplier of the games, manufactured by a third person, who sold it knowing that they were, or were likely to be dangerous, thereby subject it to liability;

u.  Put out as its own product games manufactured by another and is thus subject to the same liability as though it was their manufacturer;

31

v.  Was a seller or supplier of  games manufactured by a third person who knew or had reason to know that the games were, or were likely to be, dangerous when used by a person to whom they are delivered or for whose use they are supplied, or to others  whom the seller would expect to share in or be endangered by their use, and thus is subject to liability for bodily harm caused thereby to others because it failed to exercise reasonable care to inform others of the danger or otherwise to  protect them against it;

w.  Made, marketed, and/or sold games in a defective condition and an unreasonably dangerous condition which caused harm to persons other than the users or consumers.

x.  Made, marketed, and/or sold games that breach a warranty of fitness for a particular purpose.

y.  Made, marketed, and/or sold a product that resulted in harm to the Plaintiff, in a fashion analogous to the harm done to innocent third-party bystanders who within the circle of harm of tobacco consumers.  The tortious fall-out and harmful emanations from violent video game play did in fact harm this Plaintiff in the fashion stated herein even though he was not the consumer of this product.

110.  This Defendant had a duty of care to all three slain men which it breached. This breach, constituting negligence, constituted  wrongful actions by  this Defendant, and this negligence was the legal and proximate cause of injuries to all three slain men.

111.   The wrongful criminal acts of Defendant Devin Moore were an intervening force but not a superseding cause, and thus this Defendant is liable for the harm done to all three slain men.

112.   Given the facts alleged herein, this Defendant is liable under the Alabama Extended Manufacturers Liability Doctrine.

113.   This Defendant violated or conspired to violate Alabama's "sexual material harmful to minors" laws, as well as federal "sexual material harmful to minors" laws, by designing, manufacturing, marketing, distributing, and/or selling these games to minors, including Defendant Moore when he was a minor.  A violation of this criminal statute confers liability upon this Defendant for the acts complained of herein.

114.   This Defendant, by designing, manufacturing, marketing, distributing, and/or selling these games engaged in speech, if a murder simulation device is in fact speech, that  is incitement to violence, which constitutes a clear and present danger to public safety and/or is likely to cause imminent harm, and as such is not protected speech (See *Rice v. Palladin, supra*).

115.   The actions, the conduct, and the negligence of this Defendant reflects a wanton and/or a willful and reckless disregard for the safety of others.

116.   The actions, the conduct, and the negligence of this Defendant are so outrageous as to shock the conscience of this community, thereby giving rise, based upon the foregoing, to the tort of outrage.

117.   This Defendant misrepresented to the public that these *GTA* games were safe to be used in the fashion Defendant Moore and others used them.

118.   This Defendant suppressed information, both directly and through video game industry organizations such as the Entertainment Software Association, and kept from the public and from consumers of the important, disturbing facts about the behavioral consequences of playing these games.   This intentional suppression of information made the killing of these three slain men more likely.

119.   The actions of this Defendant constitute a public and/or private nuisance, as they have injured the public health and safety and have resulted in demonstrable harm to the State of Alabama and its residents and to this specific Plaintiff as well.   This nuisance, whether public or private, gives rise to a cause of action and compensable damages flowing to the Plaintiff herein.

## DEFENDANT TAKE-TWO AND FICTITIOUS PARTY DEFENDANTS A – I

120.   Plaintiffs reassert and reallege Paragraphs 1 through 100 and incorporate them into this Count

121.   Defendant Take-Two and Fictitious Party Defendants A – I ("Defendant") designed, manufactured, marketed, and/or supplied to Defendant Moore violent video games, specifically *Grand Theft Auto III* and *Grand Theft Auto: Vice City* which made the violence pleasurable and attractive, and disconnected the violence from the natural consequences thereof, thereby causing Moore to act out, copycat, replicate, and emulate the violence.

122.   Additionally, said games trained Moore how to point and shoot a gun in a fashion making him an extraordinarily effective killer without teaching him any of the constraints or responsibilities needed to inhibit such a killing capacity.

123.   This Defendant was negligent in doing so, thereby breaching a duty to Defendant Moore and also others, including the three men killed by Moore.  This breach was a legal cause of harm to these three slain men.  But for these *GTA* games, none of these three men would have been slain.

124.   More specifically, this Defendant, created, manufactured, marketed, and/or distributed the games, and in doing so, this Defendant:

a.  Knew or should have known that copycat violence would be caused by their products;

b.  Knew or should have known that there was an unreasonable risk of harm to others either through the continuous effect of the video games or as continued by its negligence, or by the foreseeable action of others;

c.  Realized or should have realized that its actions involved an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person;

d.  Realized or should have realized that its actions involved an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal;

e.  Intended it to affect, or realized or should have realized, that its actions were likely to affect, the conduct of another or a third person in such a manner as to create an unreasonable risk of harm to the other;

f.  Knew that improper persons, namely minors, would be influenced by viewing the games and then would cause harm to others;

35

g. Intentionally and unreasonably subjected another to harm which it should have recognized was likely to result in illness or other bodily harm to other persons. Thus, it is subject to liability to others for illness or other bodily harm of which the harm is a legal cause, although it may have had no intention of inflicting such harm, and irrespective of whether its actions were directed toward the other (such as Moore) or a third person (the three murdered men);

h. Unintentionally caused harm to another, and in doing so it is subject to liability to the other for resulting illness or bodily harm since it: 1) should have realized that their conduct involved an unreasonable risk of causing the harm, otherwise than by knowledge of the harm or peril of a third person, and 2) from facts known to it, should have realized that the harm, if it were caused, might result in illness or bodily harm;

i. Supplied directly or through a third person games it:  1) knew or had reason to know are or are likely to be dangerous for the use for which they are supplied, 2) had no reason to believe that those for whose use the games are supplied would realize its dangerous condition, and 3) failed to exercise reasonable care to inform them of its dangerous condition or of the facts which made them likely to be dangerous;

j. Supplied directly or through a third person games for another's use, knowing or having reason to know that the games were unlikely to be made reasonably safe before being put to a use which the supplier should expect them to be put, and thus it is subject to liability for harm caused by such use to those whom the supplier should expect to use the games or to be endangered by their probable use,

and who are ignorant of the dangerous character of the games or whose knowledge thereof does not make them contributory negligent, although the supplier has informed the other for whose use the games are supplied of their dangerous character;

k.  Supplied directly or through a third person  games for the use of another whom the supplier knew or had reason to know to be likely because of his youth, inexperience, or otherwise, to use them in a manner involving unreasonable risk of physical harm to others whom the supplier should expect to share in or be endangered by their use;

l.  Supplied  directly or through a third person games for another to use for the suppliers' business purposes, knowing or having reason to know that they were or were likely to be dangerous for the use for which they were supplied;

m.  Supplied to another, directly or through a third person, games to be used for the suppliers' business purposes and thus are liable to those whom they should expect to be endangered by their probable use, for physical harm caused by the use of the games in the manner for which and by persons for whose use the games were supplied, in that it:   1) failed to exercise reasonable care to make the games safe for the use for which they were supplied, or 2) failed to exercise reasonable care to discover their dangerous condition or character, and to inform those whom it should expect to use them;

n.  Supplied through a third person the games to be used for the suppliers' business purposes thereby making it subject to liability although the dangerous

37

character of the games was discoverable by an inspection which the third person is under a duty to the person injured to make;

o.  Knew or had reason to know the games to be, or to be likely to be, dangerous for use;

p.  Failed to exercise reasonable care in the making of the games which, because they were not carefully made, it should have recognized as involving an unreasonable risk of causing physical harm to those whom they should have expected to be endangered by their probable and lawful use in a manner and for a purpose for which it was supplied;

q.  Is subject to liability although the dangerous character or condition of the games was discoverable by an inspection which the seller or any other person was under a duty to the persons injured to make;

r.  Made these games using a formula intended to heighten, intensify, glamorize, and thus ultimately make more dangerous the violence and other harmful material found in the games, and even though the content of the games was disclosed to a limited degree to the potential viewing public, their content was not disclosed or warned of in a fashion that this would be likely understood by those whom they should expect to use them lawfully.  As such this Defendant is liable for physical harm caused to persons whom it should have expected to be endangered by their probable use by the failure to exercise reasonable care in using such a formula and the failure to adequately warn;

s.  Made, marketed, and/or  distributed the games under a plan or design which made them dangerous for the uses for which they were manufactured, and

therefore it is liable to others whom it should expect to be endangered by their probable use for physical harm caused by its failure to exercise reasonable care in the adoption of a safe plan or design, manufacturing, marketing, and/or sale of the games;

t.  Was a seller or supplier of the games, manufactured by a third person, who sold it knowing that they were, or were likely to be dangerous, thereby subject it to liability;

u.  Put out as its own product games manufactured by another and is thus subject to the same liability as though it was their manufacturer;

v.  Was a seller or supplier of games manufactured by a third person who knew or had reason to know that the games were, or were likely to be, dangerous when used by a person to whom they are delivered or for whose use they are supplied, or to others whom the seller would expect to share in or be endangered by their use, and thus is subject to liability for bodily harm caused thereby to others because it failed to exercise reasonable care to inform others of the danger or otherwise to protect them against it;

w.  Made, marketed, and/or sold games in a defective condition and an unreasonably dangerous condition which caused harm to persons other than the users or consumers.

x.  Made, marketed, and/or sold games that breach a warranty of fitness for a particular purpose.

y.  Made, marketed, and/or sold a product that resulted in harm to the Plaintiff, in a fashion analogous to the harm done to innocent third-party bystanders who

39

within the circle of harm of tobacco consumers. The tortious fall-out and harmful emanations from violent video game play did in fact harm this Plaintiff in the fashion stated herein even though he was not the consumer of this product.

125.   This Defendant had a duty of care to all three slain men which it breached. This breach, constituting negligence, constituted wrongful actions by this Defendant, and this negligence was the legal and proximate cause of injuries to all three slain men.

126.   The wrongful criminal acts of Defendant Devin Moore were an intervening force but not a superseding cause, and this Defendant is liable for the harm done to all three slain men.

127.   Given the facts alleged herein, this Defendant is liable under the Alabama Extended Manufacturers Liability Doctrine.

128.   This Defendant violated or conspired to violate Alabama's "sexual material harmful to minors" laws, as well as federal "sexual material harmful to minors" laws, by designing, manufacturing, marketing, distributing, and/or selling these games to minors, including Defendant Moore when he was a minor. A violation of this criminal statute confers liability upon this Defendant for the acts complained of herein.

129.   This Defendant, by designing, manufacturing, marketing, distributing, and/or selling these games engaged in speech, if a murder simulation device is in fact speech, that is incitement to violence, which constitutes a clear and present danger to public safety and/or is likely to cause imminent harm, and as such is not protected speech (See *Rice v. Palladin, supra*).

130.   The actions, the conduct, and the negligence of this Defendant reflects a wantonness and/or a willful and reckless disregard for the safety of others.

131.   The actions, the conduct, and the negligence of this Defendant are so outrageous as to shock the conscience of this community, thereby giving rise, based upon the foregoing, to the tort of outrage.

132.   This Defendant misrepresented to the public that these *GTA* games were safe to be used in the fashion Defendant Moore and others used them.

133.   This Defendant suppressed information, both directly and through video game industry organizations such as the Entertainment Software Association, and kept from the public and from consumers of the important, disturbing facts about the behavioral consequences of playing these games.   This intentional suppression of information made the killing of these three slain men more likely.

134.   The actions of this Defendant constitute a public and/or private nuisance, as they have injured the public health and safety and have resulted in demonstrable harm to the State of Alabama and its residents and to this specific Plaintiff as well.   This nuisance, whether public or private, gives rise to a cause of action and compensable damages flowing to the Plaintiff herein.

## DEFENDANT WAL-MART AND FICTITIOUS PARTY DEFENDANTS A – I

135.   Plaintiffs reassert and reallege Paragraphs 1 through 100 and incorporate them into this Count.

136.   Defendant Wal-Mart and Fictitious Party Defendants A – I ("Defendant") designed, manufactured, marketed, and/or supplied to Defendant Moore violent video games, specifically *Grand Theft Auto III* and *Grand Theft Auto: Vice City*  which made the violence pleasurable and attractive, and disconnected the violence from the natural

consequences thereof, thereby causing Moore to act out, copycat, replicate, and emulate the violence.

137.   Additionally, said games trained Moore how to point and shoot a gun in a fashion making him an extraordinarily effective killer without teaching him any of the constraints or responsibilities needed to inhibit such a killing capacity.

138.   This Defendant was negligent in doing so, thereby breaching a duty to Defendant Moore and also others, including the three men killed by Moore.  This breach was a legal cause of harm to these three slain men.  But for these *GTA* games, none of these three men would have been slain.

139.   More specifically, this Defendant, created, manufactured, marketed, and/or distributed the games, and in doing so, this Defendant:

a.  Knew or should have known that copycat violence would be caused by their products;

b.  Knew or should have known that there was an unreasonable risk of harm to others either through the continuous effect of the video games or as continued by its negligence, or by the foreseeable action of others;

c.  Realized or should have realized that its actions involved an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person;

d.  Realized or should have realized that its actions involved an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal;

e.  Intended it to affect, or realized or should have realized, that its actions were likely to affect, the conduct of another or a third person in such a manner as to create an unreasonable risk of harm to the other;

f.  Knew that improper persons, namely minors, would be influenced by viewing the games and  then would cause harm to others;

g.  Intentionally and unreasonably subjected another to harm which it should have recognized was likely to result in illness or other bodily harm to other persons. Thus, it is subject to liability to others for illness or other bodily harm of which the harm is a legal cause, although it may have had no intention of inflicting such harm, and irrespective of whether its actions were directed toward the other (such as Moore) or a third person (the three murdered men);

h.  Unintentionally caused harm to another, and in doing so it is subject to liability to the other for resulting illness or bodily harm since it: 1) should have realized that their conduct involved an unreasonable risk of causing the harm, otherwise than by knowledge of the harm or peril of a third person, and 2) from facts known to it, should have realized that the harm, if it were caused, might result in illness or bodily harm;

i.  Supplied directly or through a third person  games it:   1) knew or had reason to know are or are likely to be dangerous for the use for which they are supplied, 2) had no reason to believe that those for whose use the games are supplied would realize its dangerous condition, and 3) failed to exercise reasonable care to inform them of its dangerous condition or of the facts which made them likely to be dangerous;

43

j.  Supplied directly or through a third person games for another's use, knowing or having reason to know that the games were unlikely to be made reasonably safe before being put to a use which the supplier should expect them to be put, and thus it is subject to liability for harm caused by such use to those whom the supplier should expect to use the games or to be endangered by their probable use, and who are ignorant of the dangerous character of the games or whose knowledge thereof does not make them contributory negligent, although the supplier has informed the other for whose use the games are supplied of their dangerous character;

k.  Supplied directly or through a third person  games for the use of another whom the supplier knew or had reason to know to be likely because of his youth, inexperience, or otherwise, to use them in a manner involving unreasonable risk of physical harm to others whom the supplier should expect to share in or be endangered by their use;

l.  Supplied  directly or through a third person games for another to use for the suppliers' business purposes, knowing or having reason to know that they were or were likely to be dangerous for the use for which they were supplied;

m.  Supplied to another, directly or through a third person, games to be used for the suppliers' business purposes and thus are liable to those whom they should expect to be endangered by their probable use, for physical harm caused by the use of the games in the manner for which and by persons for whose use the games were supplied, in that it:   1) failed to exercise reasonable care to make the games safe for the use for which they were supplied, or 2) failed to exercise reasonable

care to discover their dangerous condition or character, and to inform those whom it should expect to use them;

n.    Supplied through a third person the games to be used for the suppliers' business purposes thereby making it subject to liability although the dangerous character of the games was discoverable by an inspection which the third person is under a duty to the person injured to make;

o.  Knew or had reason to know the games to be, or to be likely to be, dangerous for use;

p.  Failed to exercise reasonable care in the making of the games which, because they were not carefully made, it should have recognized as involving an unreasonable risk of causing physical harm to those whom they should have expected to be endangered by their probable and lawful use in a manner and for a purpose for which it was supplied;

q.  Is subject to liability although the dangerous character or condition of the games was discoverable by an inspection which the seller or any other person was under a duty to the persons injured to make;

r.  Made these games using a formula intended to heighten, intensify, glamorize, and thus ultimately make more dangerous the violence and other harmful material found in the games, and even though the content of the games was disclosed to a limited degree to the potential viewing public, their content was not disclosed or warned of in a fashion that this would be likely understood by those whom they should expect to use them lawfully.  As such this Defendant is liable for physical harm caused to persons whom it should have expected to be endangered by their

probable use by the failure to exercise reasonable care in using such a formula and the failure to adequately warn;

s.  Made, marketed, and/or  distributed the games under a plan or design which made them dangerous for the uses for which they were manufactured, and therefore it is liable to others whom it should expect to be endangered by their probable use for physical harm caused by its failure to exercise reasonable care in the adoption of a safe plan or design, manufacturing, marketing, and/or sale of the games;

t.  Was a seller or supplier of the games, manufactured by a third person, who sold it knowing that they were, or were likely to be dangerous, thereby subject it to liability;

u.  Put out as its own product games manufactured by another and is thus subject to the same liability as though it was their manufacturer;

v.   Was a seller or supplier of  games manufactured by a third person who knew or had reason to know that the games were, or were likely to be, dangerous when used by a person to whom they are delivered or for whose use they are supplied, or to others whom the seller would expect to share in or be endangered by their use, and thus is subject to liability for bodily harm caused thereby to others because it failed to exercise reasonable care to inform others of the danger or otherwise to  protect them against it;

w.  Made, marketed, and/or sold games in a defective condition and an unreasonably dangerous condition which caused harm to persons other than the users or consumers.

x.   Made, marketed, and/or sold games that breach a warranty of fitness for a particular purpose.

y.   Made, marketed, and/or sold a product that resulted in harm to the Plaintiff, in a fashion analogous to the harm done to innocent third-party bystanders who within the circle of harm of tobacco consumers.  The tortious fall-out and harmful emanations from violent video game play did in fact harm this Plaintiff in the fashion stated herein even though he was not the consumer of this product.

140.   This Defendant had a duty of care to all three slain men which it breached. This breach, constituting negligence, constituted wrongful actions by this Defendant, and this negligence was the legal and proximate cause of injuries to all three slain men.

141.   The wrongful criminal acts of Defendant Devin Moore were an intervening force but not a superseding cause, and this Defendant is liable for the harm done to all three slain men.

142.   Given the facts alleged herein, this Defendant is liable under the Alabama Extended Manufacturers Liability Doctrine.

143.   This Defendant violated or conspired to violate Alabama's "sexual material harmful to minors" laws, as well as federal "sexual material harmful to minors" laws, by designing, manufacturing, marketing, distributing, and/or selling these games to minors, including Defendant Moore when he was a minor.  A violation of this criminal statute confers liability upon this Defendant for the acts complained of herein.

144.   This Defendant, by designing, manufacturing, marketing, distributing, and/or selling these games engaged in speech, if a murder simulation device is in fact speech, that  is incitement to violence, which constitutes a clear and present danger to

47

public safety and/or is likely to cause imminent harm, and as such is not protected speech (See *Rice v. Palladin, supra*).

145.    The actions, the conduct, and the negligence of this Defendant reflects a wantonness and/or a willful and reckless disregard for the safety of others.

146.    The actions, the conduct, and the negligence of this Defendant are so outrageous as to shock the conscience of this community, thereby giving rise, based upon the foregoing, to the tort of outrage.

147.    This Defendant misrepresented to the public that these *GTA* games were safe to be used in the fashion Defendant Moore and others used them.

148.    This Defendant suppressed information, both directly and through video game industry organizations such as the Entertainment Software Association, and kept from the public and from consumers of the important, disturbing facts about the behavioral consequences of playing these games.    This intentional suppression of information made the killing of these three slain men more likely.

149.    The actions of this Defendant constitute a public and/or private nuisance, as they have injured the public health and safety and have resulted in demonstrable harm to the State of Alabama and its residents and to this specific Plaintiff as well.    This nuisance, whether public or private, gives rise to a cause of action and compensable damages flowing to the Plaintiff herein.

## DEFENDANT GAMESTOP AND FICTITIOUS PARTY DEFENDANTS A – I

150.    Plaintiffs reassert and reallege Paragraphs 1 through 100 and incorporate them into this Count.

151.   Defendant GameStop and Fictitious Party Defendants A – I ("Defendant") designed, manufactured, marketed, and/or supplied to Defendant Moore violent video games, specifically *Grand Theft Auto III* and *Grand Theft Auto: Vice City*  which made the violence pleasurable and attractive, and disconnected the violence from the natural consequences thereof, thereby causing Moore to act out, copycat, replicate, and emulate the violence.

152.   Additionally, said games trained Moore how to point and shoot a gun in a fashion making him an extraordinarily effective killer without teaching him any of the constraints or responsibilities needed to inhibit such a killing capacity.

153.   This Defendant was negligent in doing so, thereby breaching a duty to Defendant Moore and also others, including the three men killed by Moore.  This breach was a legal cause of harm to these three slain men.  But for these *GTA* games, none of these three men would have been slain.

154.   More specifically, this Defendant, created, manufactured, marketed, and/or distributed the games, and in doing so, this Defendant:

a.  Knew or should have known that copycat violence would be caused by  their products;

b.  Knew or should have known that there was an unreasonable risk of harm to others either through the continuous effect of the video games or as  continued by its negligence,  or by the foreseeable action of others;

c.  Realized or should have realized that its actions involved an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person;

49

d.  Realized or should have realized that its actions involved an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal;

e.  Intended it to affect, or realized or should have realized, that its actions were likely to affect, the conduct of another or a third person in such a manner as to create an unreasonable risk of harm to the other;

f.  Knew that improper persons, namely minors, would be influenced by viewing the games and then would cause harm to others;

g.  Intentionally and unreasonably subjected another to harm which it should have recognized was likely to result in illness or other bodily harm to other persons. Thus, it is subject to liability to others for illness or other bodily harm of which the harm is a legal cause, although it may have had no intention of inflicting such harm, and irrespective of whether its actions were directed toward the other (such as Moore) or a third person (the three murdered men);

h. Unintentionally caused harm to another, and in doing so it is subject to liability to the other for resulting illness or bodily harm since it: 1) should have realized that their conduct involved an unreasonable risk of causing the harm, otherwise than by knowledge of the harm or peril of a third person, and 2) from facts known to it, should have realized that the harm, if it were caused, might result in illness or bodily harm;

i. Supplied directly or through a third person  games it:   1) knew or had reason to know are or are likely to be dangerous for the use for which they are supplied, 2) had no reason to believe that those for whose use the games are supplied would

realize its dangerous condition, and 3) failed to exercise reasonable care to inform them of its dangerous condition or of the facts which made them likely to be dangerous;

j. Supplied directly or through a third person games for another's use, knowing or having reason to know that the games were unlikely to be made reasonably safe before being put to a use which the supplier should expect them to be put, and thus it is subject to liability for harm caused by such use to those whom the supplier should expect to use the games or to be endangered by their probable use, and who are ignorant of the dangerous character of the games or whose knowledge thereof does not make them contributory negligent, although the supplier has informed the other for whose use the games are supplied of their dangerous character;

k. Supplied directly or through a third person games for the use of another whom the supplier knew or had reason to know to be likely because of his youth, inexperience, or otherwise, to use them in a manner involving unreasonable risk of physical harm to others whom the supplier should expect to share in or be endangered by their use;

l. Supplied directly or through a third person games for another to use for the suppliers' business purposes, knowing or having reason to know that they were or were likely to be dangerous for the use for which they were supplied;

m. Supplied to another, directly or through a third person, games to be used for the suppliers' business purposes and thus are liable to those whom they should expect to be endangered by their probable use, for physical harm caused by the

use of the games in the manner for which and by persons for whose use the games were supplied, in that it:    1) failed to exercise reasonable care to make the games safe for the use for which they were supplied, or 2) failed to exercise reasonable care to discover their dangerous condition or character, and to inform those whom it should expect to use them;

n.    Supplied through a third person the games to be used for the suppliers' business purposes thereby making it subject to liability although the dangerous character of the games was discoverable by an inspection which the third person is under a duty to the person injured to make;

o.    Knew or had reason to know the games to be, or to be likely to be, dangerous for use;

p.    Failed to exercise reasonable care in the making of the games which, because they were not carefully made, it should have recognized as involving an unreasonable risk of causing physical harm to those whom they should have expected to be endangered by their probable and lawful use in a manner and for a purpose for which it was supplied;

q.    Is subject to liability although the dangerous character or condition of the games was discoverable by an inspection which the seller or any other person was under a duty to the persons injured to make;

r.    Made these games using a formula intended to heighten, intensify, glamorize, and thus ultimately make more dangerous the violence and other harmful material found in the games, and even though the content of the games was disclosed to a limited degree to the potential viewing public, their content was not disclosed or

warned of in a fashion that this would be likely understood by those whom they should expect to use them lawfully.  As such this Defendant is liable for physical harm caused to persons whom it should have expected to be endangered by their probable use by the failure to exercise reasonable care in using such a formula and the failure to adequately warn;

s.  Made, marketed, and/or  distributed the games under a plan or design which made them dangerous for the uses for which they were manufactured, and therefore it is liable to others whom it should expect to be endangered by their probable use for physical harm caused by its failure to exercise reasonable care in the adoption of a safe plan or design, manufacturing, marketing, and/or sale of the games;

t. Was a seller or supplier of the games, manufactured by a third person, who sold it knowing that they were, or were likely to be dangerous, thereby subject it to liability;

u. Put out as its own product games manufactured by another and is thus subject to the same liability as though it was their manufacturer;

v.  Was a seller or supplier of  games manufactured by a third person who knew or had reason to know that the games were, or were likely to be, dangerous when used by a person to whom they are delivered or for whose use they are supplied, or to others whom the seller would expect to share in or be endangered by their use, and thus is subject to liability for bodily harm caused thereby to others because it failed to exercise reasonable care to inform others of the danger or otherwise to  protect them against it;

53

w. Made, marketed, and/or sold games in a defective condition and an unreasonably dangerous condition which caused harm to persons other than the users or consumers.

x. Made, marketed, and/or sold games that breach a warranty of fitness for a particular purpose.

y. Made, marketed, and/or sold a product that resulted in harm to the Plaintiff, in a fashion analogous to the harm done to innocent third-party bystanders who within the circle of harm of tobacco consumers. The tortious fall-out and harmful emanations from violent video game play did in fact harm this Plaintiff in the fashion stated herein even though he was not the consumer of this product.

155.   This Defendant had a duty of care to all three slain men which it breached. This breach, constituting negligence, constituted wrongful actions by this Defendant, and this negligence was the legal and proximate cause of injuries to all three slain men.

156.   The wrongful criminal acts of Defendant Devin Moore were an intervening force but not a superseding cause, and this Defendant is liable for the harm done to all three slain men.

157.   Given the facts alleged herein, this Defendant is liable under the Alabama Extended Manufacturers Liability Doctrine.

158.   This Defendant violated or conspired to violate Alabama's "sexual material harmful to minors" laws, as well as federal "sexual material harmful to minors" laws, by designing, manufacturing, marketing, distributing, and/or selling these games to minors, including Defendant Moore when he was a minor.  A violation of this criminal statute confers liability upon this Defendant for the acts complained of herein.

159.   This Defendant, by designing, manufacturing, marketing, distributing, and/or selling these games engaged in speech, if a murder simulation device is in fact speech, that is incitement to violence, which constitutes a clear and present danger to public safety and/or is likely to cause imminent harm, and as such is not protected speech (See *Rice v. Palladin, supra*).

160.   The actions, the conduct, and the negligence of this Defendant reflects a wantonness and/or a willful and reckless disregard for the safety of others.

161.   The actions, the conduct, and the negligence of this Defendant are so outrageous as to shock the conscience of this community, thereby giving rise, based upon the foregoing, to the tort of outrage.

162.   This Defendant misrepresented to the public that these *GTA* games were safe to be used in the fashion Defendant Moore and others used them.

163.   This Defendant suppressed information, both directly and through video game industry organizations such as the Entertainment Software Association, and kept from the public and from consumers of the important, disturbing facts about the behavioral consequences of playing these games.   This intentional suppression of information made the killing of these three slain men more likely.

164.   The actions of this Defendant constitute a public and/or private nuisance, as they have injured the public health and safety and have resulted in demonstrable harm to the State of Alabama and its residents and to this specific Plaintiff as well.  This nuisance, whether public or private, gives rise to a cause of action and compensable damages flowing to the Plaintiff herein.

55

## DAMAGES

WHEREFORE, Plaintiffs demand an award of damages including punitive damages against the Defendants, Sony, Take-Two, Wal-Mart, GameStop, Moore, and Fictitious Party Defendants A – I, who are jointly and severally liable to these Plaintiffs in an amount in excess of $600 million under the Alabama wrongful death statute.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by struck jury.

## RIGHT TO AMEND

Plaintiffs reserve the right to amend this complaint as additional facts may come to be known.

NELSON, DORROH, GRAY, & NEWSOME, L.L.C.
Attorneys for Plaintiffs
2216 14th Street
Tuscaloosa, AL 35401
Tel: (205) 349-3449
Fax: (205) 345-5281

By: _____
PATRICK GRAY
Alabama Bar No. GRA-080


JOHN B. THOMPSON
Florida Licensed Atty. for Plaintiffs
Alabama *Pro Hac Vice* Applicant
1172 South Dixie Hwy
Suite 111
Coral Gables, Florida 33146



By: _____
JOHN B. THOMPSON
Florida Bar No. 231665


REISER & ASSOCIATES, P.A.
Florida Licensed Atty. for Plaintiffs
Alabama *Pro Hac Vice* Applicant
Pal-Med Building, Suite 410
7150 West 20th Avenue
Hialeah, Florida 33016
Tel:    (305) 379-5316
Fax:    (305) 379-6917



By: _____
RAYMOND A. REISER
Florida Bar No. 215783

56

<u>Request for Service by Certified Mail</u>

Plaintiffs request service of the summons and complaint upon defendants by certified mail.

_____
Patrick O. Gray
Attorney for Plaintiffs

<u>Plaintiffs' addresses:</u>
c/o Nelson, Dorroh, Gray & Newsome, LLC
Attorneys at Law
2216 14th Street (35401)
P. O. Box 1788
Tuscaloosa, Alabama  35403

<u>Defendants' addresses:</u>
Sony Corporation of America
550 Madison Avenue
New York, NY  10022

Sony Computer Entertainment, Inc.
550 Madison Avenue
New York, NY  10022

Sony Computer Entertainment America, Inc.
P. O. Box 5888
San Mateo, CA  94402-0888

Take-Two Interactive Software, Inc.
622 Broadway
New York, NY  10012

Wal-Mart Stores, Inc.
702 N.W. 8th Street
Bentonville, AR  72716

Gamestop, Inc.
2250 William D. Tate Avenue
Grapevine, TX  76051

Devin Moore
c/o Tuscaloosa County Jail
Tuscaloosa, Alabama 35401

```
                    ... COURT PAYMENT SYSTEM
                         CICUIT JUDICIAL OUR CENTER

FAYETTE COUNTY
DATE OF RECEIPT: 02/14/2005   TIME: 16:16:11   RECEIPT NUMBER: 0017665
RECEIPT FOR CASE: CV 2005 000015 00   BATCH: 2005111
RECEIVED FROM: NELSON DORROH GRAY & NEWSOME L

STEVE STRICKLAND ET VS SONY CORPORATION OF AMERICA ET AL

ACCOUNTS RECEIPTED:
        AOCC                $40.32
        CVAF               $100.00
        CV95               $306.00
        JDMD               $100.00

RECEIVED BY: SCW        CHECK AMOUNT        $546.32
```

| State of Alabama<br>Unified Judicial System | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Nun.<br>C V 2 0 0 5 ☐ ☐ ☐ 1 9 ☐ ☐ . ☐ ☐ |
|---|---|---|
| Form ARCivP-93   Rev. 5/99 | | Date of Filing:          Judge Code:<br>☐☐  ☐☐  ☐☐☐☐<br>Month   Day   Year |

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF _____ **FAYETTE COUNTY** _____, ALABAMA

*(Name of County)*

**STEVE STRICKLAND, et al.**                    v.    **SONY CORPORATION OF AMERICA, et al.**

Plaintiff                                          Defendant

**First Plaintiff**  ☐ Business  ☒ Individual        **First Defendant**  ☒ Business  ☐ Individual
                     ☐ Government  ☐ Other                              ☐ Government  ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**

☒ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonness
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PROPERTY INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**

*Original*

☐ ____ - dification/Bond Forfeiture Appeal/
            ubpoena/Petition to Preserve
☐ ____ - omain/Right-of-Way
☐ ____ - Seizure
☐ ____ - Equity Non-Damages Actions/Declaratory Judgment/Injunction
            Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN** (check one):   F ☒ INITIAL FILING     A ☐ APPEAL FROM DISTRICT COURT     O ☐ OTHER: _____
                          R ☐ REMANDED          T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

2005 FEB 14 AM 3: 26
FAYETTE COUNTY
J. EDDY SMITH
CIRCUIT CLERK

**HAS JURY TRIAL BEEN DEMANDED?**  ☒ YES  ☐ NO    Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

**RELIEF REQUESTED:**  ☒ MONETARY AWARD REQUESTED    ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**  G R A 0 8 0    2/14/05    _____
                                    Date        Signature of Attorney/Party filing this form
                                                Patrick O. Gray

**MEDIATION REQUESTED:**  ☐ YES  ☒ NO  ☐ UNDECIDED

```
AVSO351                                               CV 2005 000019.00

                                    JUDGE: JAMES W. MOORE, JR
-------------------------------------------------------------------------
                    ALABAMA JUDICIAL DATA CENTER
                       CASE ACTION SUMMARY
                          CIRCUIT CIVIL
-------------------------------------------------------------------------
    IN THE CIRCUIT  COURT OF  FAYETTE       COUNTY

    STEVE STRICKLAND ET VS SONY CORPORATION OF AMERICA ET AL
  FILED: 02/14/2005 TYPE: WRONGFUL DEATH        TYPE TRIAL: JURY      TRACK:
-------------------------------------------------------------------------
**********************************************************************
 DATE1:              CA:               CA DATE:
 DATE2:              AMT:       $.00   PAYMENT:
 DATE3:
**********************************************************************
 PLAINTIFF   001: STRICKLAND STEVE
                                 ATTORNEY: GRAY PATRICK O'NEAL
                                 GRA080
                 , AL  00000-0000
                 PHONE: (205)000-0000
  ENTERED: 02/14/2005 ISSUED:             TYPE:
  SERVED:              ANSWERED:             JUDGEMENT:
-------------------------------------------------------------------------
 PLAINTIFF   002: MEALER HENRY
                                 ATTORNEY: GRAY PATRICK O'NEAL
                                 GRA080
                 , AL  00000-0000
                 PHONE: (205)000-0000
  ENTERED: 02/14/2005 ISSUED:             TYPE:
  SERVED:              ANSWERED:             JUDGEMENT:
-------------------------------------------------------------------------
 DEFENDANT   001: SONY CORPORATION OF AMERICA
                 550 MADISON AVE         ATTORNEY: *** PRO SE ***

                 NEW YORK, NY  10022-0000
                 PHONE: (205)000-0000
  ENTERED: 02/14/2005 ISSUED:             TYPE:
  SERVED:              ANSWERED:             JUDGEMENT:
-------------------------------------------------------------------------
 DEFENDANT   002: SONY COMPUTER ENTERTAINMENT INC
                 550 MADISON AVE         ATTORNEY: *** PRO SE ***

                 NEW YORK, NY  10022-0000
                 PHONE: (205)000-0000
  ENTERED: 02/14/2005 ISSUED:             TYPE:
  SERVED:              ANSWERED:             JUDGEMENT:
-------------------------------------------------------------------------
 DEFENDANT   003: SONY COMPUTER ENTERTRAINMENT AMERICA INC
                 PO BOX 5888             ATTORNEY: *** PRO SE ***

                 SAN MATEO, CA  94402-0888
                 PHONE: (205)000-0000
  ENTERED: 02/14/2005 ISSUED:             TYPE:
  SERVED:              ANSWERED:             JUDGEMENT:
-------------------------------------------------------------------------
 DEFENDANT   004: SONY COMPUTER ENTERTRAINMENT AMERICA INC
                 PO BOX 5888             ATTORNEY: *** PRO SE ***

                 SAN MATEO, CA  94402-0888
                 PHONE: (205)000-0000
  ENTERED: 02/14/2005 ISSUED:             TYPE:
  SERVED:              ANSWERED:             JUDGEMENT:
-------------------------------------------------------------------------
 DEFENDANT   005: TAKE-TWO INTERACTIVE SOFTWARE INC
                 622 BROADWAY            ATTORNEY: *** PRO SE ***

                 NEW YORK, NY  10012-0888
                 PHONE: (205)000-0000
  ENTERED: 02/14/2005 ISSUED:             TYPE:
  SERVED:              ANSWERED:             JUDGEMENT:
-------------------------------------------------------------------------
SCW   02/14/2005                                      CV 2005 000019.00
```

```
| AVS0351                                              CV 2005 000019.00 |
|                                                                        |
|                                           JUDGE: JAMES W. MOORE, JR    |
|------------------------------------------------------------------------|
|                     ALABAMA JUDICIAL DATA CENTER                       |
|                       CASE ACTION SUMMARY                              |
|                          CIRCUIT CIVIL                                 |
|------------------------------------------------------------------------|
|   IN THE CIRCUIT  COURT OF  FAYETTE        COUNTY                      |
|                                                                        |
|    STEVE STRICKLAND ET VS SONY CORPORATION OF AMERICA ET AL            |
|  FILED: 02/14/2005 TYPE: WRONGFUL DEATH      TYPE TRIAL: JURY   TRACK: |
| ************************************************************************ |
|  DATE1:            CA:                  CA DATE:                       |
|  DATE2:            AMT:         $.00  PAYMENT:                         |
|  DATE3:                                                                |
| ************************************************************************ |
|----------------------------------------------------------------------- |
|  DEFENDANT  006: WAL-MART STORES, INC                                  |
|                  702 N W 8TH STREET         ATTORNEY: *** PRO SE ***   |
|                                                                        |
|                  BENTONVILLE, AR  72716-0888                           |
|                  PHONE: (205)000-0000                                  |
|  ENTERED:  02/14/2005 ISSUED:            TYPE:                         |
|  SERVED:              ANSWERED:          JUDGEMENT:                    |
|----------------------------------------------------------------------- |
|  DEFENDANT  007: GAMESTOP INC                                          |
|                  2250 WILLIAM D TATE AVE   ATTORNEY: *** PRO SE ***    |
|                                                                        |
|                  GRAPEVINE, TX  76051-0888                             |
|                  PHONE: (205)000-0000                                  |
|  ENTERED:  02/14/2005 ISSUED:            TYPE:                         |
|  SERVED:              ANSWERED:          JUDGEMENT:                    |
|----------------------------------------------------------------------- |
|  DEFENDANT  008: DEVIN MOORE                                           |
|                  C/O TUSCALOOSA CO JAIL    ATTORNEY: *** PRO SE ***    |
|                                                                        |
|                  TUSCALOOSA, AL  35401-0000                            |
|                  PHONE: (205)000-0000                                  |
|  ENTERED:  02/14/2005 ISSUED:            TYPE:                         |
|  SERVED:              ANSWERED:          JUDGEMENT:                    |
|----------------------------------------------------------------------- |
|                                                                        |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
| -------|-------------------------------------------------------------- |
SCW   02/14/2005                                      CV 2005 000019.00
```